# IN THE UNITED STATES COURT OF APPEALS
# FOR THE FOURTH CIRCUIT

---

No. 24-6665

---

GREGORY ALLEN BONNIE,

*Petitioner-Appellant*,

*vs.*

WARDEN DUNBAR,

*Respondent-Appellee*.

---

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA AT FLORENCE
HONORABLE DAVID C. NORTON, U.S. DISTRICT JUDGE

---

**Brief of Amici Curiae Due Process Institute and National Association of Criminal Defense Lawyers in Support of Petitioner-Appellant and Supporting Reversal**

---

Timothy W. Grinsell
Hoppin Grinsell LLP
11 Hanover Sq., Ste. 703
New York, NY 10005
646-475-3550
tim@hoppingrinsell.com

*Counsel for Due Process Institute and National Association of Criminal Defense Lawyers*

**TABLE OF CONTENTS**

TABLE OF CONTENTS.................................................................................. i

TABLE OF AUTHORITIES ........................................................................... ii

DISCLOSURE STATEMENT .........................................................................1

INTEREST OF AMICI CURIAE.....................................................................1

SUMMARY OF ARGUMENT .......................................................................2

ARGUMENT ..................................................................................................3

    I.   The First Step Act is cost-saving legislation based on state-level models......3

        A.    The FSA is a cost-saving statute............................................................4

        B.    Senator Cornyn, a decisive backer of the FSA, understood it as a cost-saving measure based on state models.............................................................5

        C.    The FSA is based on state models. ........................................................8

    II.   The history, purpose, and structure of the FSA render section 3632(d)(4)(D) ambiguous..................................................................................................10

        A.    BOP's interpretation costs millions more...............................................10

        B.    State models show Congress intended broad credit eligibility...............11

        C.    Congress systematically reduced BOP authority throughout the First Step Act. ..................................................................................................15

    III.  The rule of lenity resolves any ambiguity in favor of Mr. Bonnie................17

        A.    The First Step Act's earned time credit provisions are penal.................17

        B.    The rule of lenity applies. ....................................................................19

CONCLUSION...............................................................................................21

# TABLE OF AUTHORITIES

**Cases**

*Barber v. Thomas*,
  560 U.S. 474 (2010) ..................................................................18

*Bifulco v. United States*,
  447 U.S. 381 (1980) ..................................................................19

*Castillo v. United States*,
  2024 WL 4533516 (S.D.N.Y. Oct. 18, 2024) ......................................18

*Lynce v. Mathis*,
  519 U.S. 433 (1997) ..................................................................18

*Mancillas v. Fed. Bureau of Prisons*,
  2023 WL 5404229 (D. Md. Aug. 22, 2023)................................... 17, 21

*Mikell v. Brian*,
  2010 WL 6797007 (S.D. Ga. Nov. 9, 2010) .......................................14

*Moskal v. United States*,
  498 U.S. 103 (1990) ..................................................................20

*Sok v. Eischen*,
  2022 WL 17156797 (D. Minn. Oct. 26, 2022), *report and recommendation adopted*, 2022 WL 17128929 (D. Minn. Nov. 22, 2022), *aff'd*, 2023 WL 5282709 (8th Cir. Aug. 17, 2023) ............................................. 17, 21

*United States v. Bass*,
  404 U.S. 336 (1971) ..................................................................19

*United States v. Brooker*,
  976 F.3d 228 (2d Cir. 2020) .........................................................16

ii

*United States v. Davis*,
   588 U.S. 445 (2019) ..............................................................................19

*United States v. Lacher*,
   134 U.S. 624 (1890) ..............................................................................19

*United States v. White*,
   620 F.3d 401 (4th Cir. 2010) ................................................................10

*United States v. Wiltberger*,
   18 U.S. 76 (1820) ............................................................................ 19, 20

*Weaver v. Graham*,
   450 U.S. 24 (1981) .......................................................................... 17, 18

**Statutes**

First Step Act of 2018, Pub. L. No. 115-391, 132 Stat 5194 (2018) ............... *passim*

H.B. 2649, 82d Leg., R.S. (Tex. 2011) ...................................................12

Justice Reinvestment Act, 2016 Md. Laws 515 (S.B. 1005) .................................14

Md. Code Ann., Corr. Servs. § 3-702(a)–(b) (West 2010) ....................................15

18 U.S.C. § 924(c) ...................................................................................10

18 U.S.C. § 929 .......................................................................................10

18 U.S.C. § 1028A ..................................................................................10

18 U.S.C. § 1791 .....................................................................................10

18 U.S.C. § 3146 .....................................................................................10

18 U.S.C. § 3147 .....................................................................................10

18 U.S.C. § 3584(c) ...................................................................................................21

18 U.S.C. § 3621(b) ...................................................................................................16

18 U.S.C. § 3631(a) ...................................................................................................16

18 U.S.C. § 3632(a) ...................................................................................................16

18 U.S.C. § 3632(d)(4)(D) .................................................................................. *passim*

18 U.S.C. § 3632(d)(4)(D)(xxii) .................................................................................10

18 U.S.C. § 3632(f)(4) ...............................................................................................16

18 U.S.C. § 3632(g) ...................................................................................................16

18 U.S.C. § 4322 ........................................................................................................16

**Other Authorities**

Ames Grawert & Tim Lau, *How the FIRST STEP Act Became Law—and What Happens Next*, Brennan Center for Justice (Jan. 4, 2019), https://bit.ly/2Z8aPsn...................................................................................................7

*Annual Determination of Average Cost of Incarceration Fee*, 88 FR 65405 (Sept. 22, 2023) ......................................................................................................11

CORRECTIONS Act, S. 467, 114th Cong. § 2 (2015) ...............................................6

Einer Elhauge, *Preference-Estimating Statutory Default Rules*, 102 Colum. L. Rev. 2027 (2002)..........................................................................5

John O'Brien, *Fiscal Note RE: HB2649*, Legislative Budget Board Fiscal Note, 82d Leg., R.S. (May 19, 2011), https://tinyurl.com/3abbcy2p ...........................12

FIRST STEP Act, H.R. 5682, 115th Cong. (2018) ....................................................6

Ga. Dep't of Corr., *Standard Operating Procedures: Performance Incentive Credit Program*, IIB01-0021 (Nov. 1, 2011) ...................................................................13

H.R. Rep. No. 115-699 (2018).............................................................................4

Md. Just. Reinvestment Coordinating Council, *Final Report* (Dec. 2015), https://tinyurl.com/w94c2vc5 .........................................................................14

*Remarks by President Trump at Signing Ceremony for S. 756, the "First Step Act of 2018" and H.R. 6964, the "Juvenile Justice Reform Act of 2018,"* 2018 WL 6715859, White House (Dec. 21, 2018)..................................................................7

*Report of the Special Council on Criminal Justice Reform for Georgians* (2011), https://tinyurl.com/mprvb776...............................................................................12

U.S. Sentencing Comm'n, SPSS Datafiles For Fiscal Years 2019–2023, https://www.ussc.gov/research/datafiles/commission-datafiles..................... 10, 11

164 Cong. Rec. H10362 (daily ed. Dec. 20, 2018)...............................................5, 9

164 Cong. Rec. H10430 (daily ed. Dec. 20, 2018)...............................................3, 7

164 Cong. Rec. S7641 (daily ed. Dec. 17, 2018) ..................................................5

164 Cong. Rec. S7642 (daily ed. Dec. 17, 2018) ..................................................16

164 Cong. Rec. S7646 (daily ed. Dec. 17, 2018) ..................................................8

164 Cong. Rec. S7649 (daily ed. Dec. 17, 2018) .................................................3, 9

164 Cong. Rec. S7737 (daily ed. Dec. 18, 2018) ..................................................7

164 Cong. Rec. S7742 (daily ed. Dec. 18, 2018) ..................................................7

164 Cong. Rec. S7743 (daily ed. Dec. 18, 2018) ...............................................5, 8

164 Cong. Rec. S7744 (daily ed. Dec. 18, 2018) ......................................................5

164 Cong. Rec. S7746 (daily ed. Dec. 18, 2018) ...................................................6, 8

164 Cong. Rec. S7749 (daily ed. Dec. 18, 2018) ............................................ 4, 7, 9

164 Cong. Rec. S7763 (daily ed. Dec. 18, 2018) ......................................................4

164 Cong. Rec. S7774 (daily ed. Dec. 18, 2018). ...................................................5, 9

164 Cong. Rec. S7781 (daily ed. Dec. 18, 2018) ...................................................3, 7

164 Cong. Rec. S7838 (daily ed. Dec. 19, 2018) ......................................................5

28 C.F.R. § 523.42(b)(2)..........................................................................................11

## DISCLOSURE STATEMENT

The Due Process Institute has no parent corporation, and no publicly held corporation owns 10% or more of its stock.  The National Association of Criminal Defense Lawyers has no parent corporation, and no publicly held corporation owns 10% or more of its stock.

## INTEREST OF AMICI CURIAE[1]

The Due Process Institute is a nonprofit, bipartisan public interest organization that works to honor, preserve, and restore procedural fairness in the criminal justice system.

The National Association of Criminal Defense Lawyers (NACDL) is a nonprofit voluntary professional bar association that works on behalf of criminal defense attorneys to ensure justice and due process for those accused of crime or misconduct.  NACDL was founded in 1958.  It has a nationwide membership of many thousands of direct members, and up to 40,000 with affiliates.  NACDL's members include private criminal defense lawyers, public defenders, military defense counsel, law professors, and judges.  NACDL is the only nationwide professional bar association for public defenders and private criminal defense

---

[1] All parties have consented to the filing of this brief. No counsel for a party authored this brief in whole or in part, and no person other than counsel for amici curiae made a monetary contribution to fund the preparation or submission of this brief.

1

lawyers. NACDL is dedicated to advancing the proper, efficient, and just administration of justice. NACDL files numerous amicus briefs each year in the U.S. Supreme Court and other federal and state courts, seeking to provide amicus assistance in cases that present issues of broad importance to criminal defendants, criminal defense lawyers, and the criminal justice system as a whole.

## SUMMARY OF ARGUMENT

The Supreme Court has long held that freedom from unlawful imprisonment lies at the heart of liberty. Yet the Bureau of Prisons ("BOP") has improperly interpreted the First Step Act of 2018 ("FSA") to deny thousands of prisoners credits earned through rehabilitation programs, unlawfully extending their imprisonment and frustrating Congress's intent to reduce federal prison costs.

18 U.S.C. § 3632(d)(4)(D) states that a prisoner is ineligible for such credits if they are "serving a sentence for a conviction under any of" sixty-eight enumerated offenses. When a prisoner like Mr. Bonnie is serving consecutive sentences—one for a listed crime, one for an unlisted crime—BOP treats the entire combined term as ineligible. This interpretation conflicts with the Act's history, purpose, and structure in three ways.

First, BOP's interpretation would forfeit roughly half a billion dollars in potential savings—savings that Congress explicitly sought in passing the FSA. Sentencing Commission data reveals that BOP's approach denies credits to at least

2

2,000 prisoners annually who receive mixed eligible and ineligible sentences, squandering hundreds of millions in potential cost reductions.

Second, Congress built the FSA on state models that broadly permitted credit eligibility. The legislative record shows no intent to depart from these models. Third, throughout the FSA, Congress cut BOP's authority—establishing Attorney General oversight, fixing BOP's past misinterpretations with respect to credit-granting provisions, and limiting BOP's discretion. Congress did not grant BOP power to restrict credits while simultaneously curbing its authority elsewhere.

Thus, section 3632(d)(4)(D) is, at minimum, ambiguous about whether "serving a sentence for a conviction" applies to entire prison terms or individual sentences. And because this ambiguity affects punishment length, the rule of lenity requires resolving it in Mr. Bonnie's favor.

## ARGUMENT

### I. The First Step Act is cost-saving legislation based on state-level models.

Hailed by Congress as "the most significant criminal justice reform bill in a generation," the First Step Act of 2018 marked a rare moment of bipartisan consensus, passing with margins of 87-12 in the Senate and 358-36 in the House. 164 Cong. Rec. S7649 (daily ed. Dec. 17, 2018) (statement of Sen. Grassley); 164 Cong. Rec. S7781 (daily ed. Dec. 18, 2018) (Senate margin); 164 Cong. Rec. H10430 (daily ed. Dec. 20, 2018) (House margin). Congress deliberately crafted

3

the Act as a cost-saving measure, drawing on state-level reforms that had reduced both incarceration costs and crime rates. Texas's reforms served as a particularly influential model, and Texas's Senator Cornyn as a particularly decisive legislator.

## A.    The FSA is a cost-saving statute.

With federal prison costs consuming nearly one-third of the Department of Justice's budget, fiscal concerns drove support for the FSA across party lines. *See* 164 Cong. Rec. S7749 (daily ed. Dec. 18, 2018) (statement of Sen. Leahy). A House Committee Report acknowledged that "it [is] in the fiscal interest of the government to reduce recidivism," H.R. Rep. No. 115-699, at 22, and the Committee expressed "deep[] concern[] with the increased burden to taxpayers for the burgeoning costs of inmate incarceration," noting how these costs forced "other important Department [of Justice] priorities... into competition for these limited funds." *Id.* at 23.

During floor debate, Senator Leahy similarly noted that "[b]ecause public safety dollars are finite, [the cost of housing federal offenders] strips critical resources away from law enforcement strategies that have been proven to make our communities safer." 164 Cong. Rec. S7749 (daily ed. Dec. 18, 2018). Senator Booker characterized such expenditures as "throwing an exorbitant amount of taxpayer dollars into the black hole of mass incarceration." 164 Cong. Rec. S7763 (daily ed. Dec. 18, 2018). Senator Blumenthal stated that "the human and financial

4

costs of mass incarceration simply are not worth the costs." 164 Cong. Rec. S7744 (daily ed. Dec. 18, 2018).[2]

Both parties agreed. Alongside Democrats like Sens. Leahy, Booker, and Blumenthal, Republicans like Georgia's Representative Collins described the FSA as fundamentally "about money and morals," explaining it as "doing good with the taxpayer dollar and also giving people a chance, from a moral perspective, to have a second chance." 164 Cong. Rec. H10362 (daily ed. Dec. 20, 2018). Senator Grassley emphasized that the legislation was needed to "make the system work better for the taxpayers, help law enforcement fight crime, and put a stopper in the revolving prison door." 164 Cong. Rec. S7838 (daily ed. Dec. 19, 2018).

### B. Senator Cornyn, a decisive backer of the FSA, understood it as a cost-saving measure based on state models.

The burgeoning costs of federal imprisonment spurred Texas's Senator John Cornyn to action. Senator Cornyn's views deserve particular attention in construing the FSA's meaning because his agreement was necessary to pass it. *See* Einer Elhauge, *Preference-Estimating Statutory Default Rules*, 102 Colum. L. Rev.

---

[2] *See also* 164 Cong Rec. S7743 (daily ed. Dec. 18, 2018) (statement of Sen. Durbin ) ("Reduce the cost to taxpayers of the prisons, but reduce crime on the streets too. Make sure you do both."); 164 Cong. Rec. S7774 (daily ed. Dec. 18, 2018) (statement of Sen. Cardin) ("This is intended to reduce the likelihood of reoffending, as well as to benefit victims and families and reduce costs to taxpayers.").

2027, 2081 (2002) (in interpreting statutes, "the court should focus on the marginal legislators whose agreement was necessary to enact the legislation").

The FSA started as a prison reform bill in 2014, introduced by Senators Cornyn (Republican of Texas) and Whitehouse (Democrat of Rhode Island).  164 Cong Rec. S7641 (daily ed. Dec. 17, 2018) (statement of Sen. Cornyn) ("[M]ore than three-quarters of the bill was based on the CORRECTIONS Act that Senator Whitehouse and I introduced in 2014, which is the prison reform component of the legislation.").  Many of the same prison reform provisions contained in that bill ended up in the FSA, including the idea for earned time credits.  CORRECTIONS Act, S. 467, 114th Cong. § 2 (2015).

Sen. Cornyn drew on Texas's experience.  As he explained, "In Texas, the initial interest in criminal justice reform was first cost-driven.  In other words, people were wondering: How are we going to continue to pay for 17,000 more prison beds that we think we are going to need because of our growing population?" 164 Cong. Rec. S7746 (daily ed. Dec. 18, 2018).

The Texas reforms proved successful.  Using recidivism reduction programs similar to those Sen. Cornyn included in his bill, Texas "reduced [its] incarceration rate and [its] crime rate by double digits at the same time." *Id*.

Sen. Cornyn's prison reform bill went nowhere until 2018, when a version passed the House.  FIRST STEP Act, H.R. 5682, 115th Cong.  Passage in the

6

Senate was stalled by the Democratic opposition, which refused to pass a prison reform bill without including sentencing reforms as well.  Ames Grawert & Tim Lau, *How the FIRST STEP Act Became Law—and What Happens Next*, Brennan Center for Justice (Jan. 4, 2019), available at https://bit.ly/2Z8aPsn.  As time ran out on the legislative year, Sen. Cornyn agreed to a compromise that saved the bill and led to its passage.  164 Cong. Rec. S7737 (daily ed. Dec. 18, 2018) (statement of Sen. McConnell) ("Particular credit for this [advancing the First Step Act] belongs to Senator Cornyn."); *see also* Grawert & Lau, *How the FIRST STEP Act Became Law*.

The First Step Act passed both Houses of Congress by overwhelming margins.  It was "not just bipartisan," but "nearly nonpartisan."  164 Cong. Rec. S7749 (daily ed. Dec. 18, 2018) (statement of Sen. Leahy); see *id.* at S7742 (statement of Sen. Durbin) ("I can't remember another bill that has had this kind of support, left and right, liberal, conservative, Republican, Democrat.").  In the Senate, the bill was introduced in virtually its current form on December 13, 2018, and passed five days later. See *id.* at S7781 (daily ed. Dec. 18, 2018).  Two days after that, the House passed the bill. 164 Cong. Rec. H10430 (daily ed. Dec. 20, 2018).

President Trump signed the First Step Act into law on December 21, 2018, describing it as "an incredible moment" for "criminal justice reform." *Remarks by*

7

*President Trump at Signing Ceremony for S. 756, the "First Step Act of 2018" and H.R. 6964, the "Juvenile Justice Reform Act of 2018,"* 2018 WL 6715859, at \*16, White House (Dec. 21, 2018).  Members of Congress recognized the Act as "one of the most historic changes in criminal justice legislation in our history," 164 Cong. Rec. S7646 (daily ed. Dec. 17, 2018) (statement of Sen. Durbin).

## C.    The FSA is based on state models.

With the FSA, Sen. Cornyn and other legislators sought to replicate successful state-level reforms that had reduced costs, lowered incarceration rates, and improved public safety.  Sen. Cornyn's home state of Texas proved particularly influential.  As he explained, Texas's experience began with a fiscal crisis.  164 Cong. Rec. S7746 (daily ed. Dec. 18, 2018).  Using recidivism reduction programs similar to those mandated by the FSA, Texas "reduced [its] incarceration rate and [its] crime rate by double digits at the same time." *Id*. Senator Durbin highlighted this success: "[Y]ou may be shocked to think that Texas would be a leader in this, but they have been, and they have seen a reduction in the incidence of crime and a reduction in the incidence of incarceration—things we like to see happen. Reduce the cost to taxpayers of the prisons, but reduce crime on the streets too." 164 Cong. Rec. S7743.

Similar successes in other states provided Congress with concrete evidence that such reforms work.  Representative Collins cited his own experience in

8

Georgia. "This is also sort of special from my perspective as well, for in my home State of Georgia, Governor Nathan Deal, a former distinguished Member of this body, went home and began spearheading criminal justice reform legislation that has made Georgia safer while saving taxpayer dollars." 164 Cong. Rec. H10362 (daily ed. Dec. 20, 2018). Senator Cardin pointed to Maryland's Justice Reinvestment Act, which "seeks to reduce Maryland's prison population and use the savings to provide for more effective treatment to offenders before, during, and after incarceration." 164 Cong. Rec. S7774 (daily ed. Dec. 18, 2018). Many other legislators similarly lauded the states' experience with the FSA's reforms. 164 Cong. Rec. S7649 (daily ed. Dec. 17, 2018) (statement of Sen. Grassley) ("We have evidence from the States of Texas, Georgia, Mississippi, and many others."); 164 Cong. Rec. S7749 (daily ed. Dec. 18, 2018) (statement of Sen. Leahy) ("By taking steps to responsibly reduce our prison population, we can save both money and reduce crime. That is a lesson states across the country have already learned.").

Thus, confronting unsustainable prison costs, Congress looked to proven state models—particularly Texas's successful reforms—and crafted legislation that earned nearly unanimous support. Congress intended the FSA to achieve meaningful cost reductions through the same mechanisms that had proven successful at the state level.

9

## II.   The history, purpose, and structure of the FSA render section 3632(d)(4)(D) ambiguous.

BOP's interpretation of § 3632(d)(4)(D) would forfeit $480 million in potential savings.  The state models Congress used as templates uniformly allow broader credit eligibility than BOP's interpretation allows.  And Congress consistently limited BOP's authority throughout the Act.  BOP's interpretation thus conflicts with the Act's fiscal purpose, its precedents, and its structural design, creating significant doubt about § 3632(d)(4)(D)'s intended scope.

### A.   BOP's interpretation costs millions more.

Sentencing Commission data reveal the costs of BOP's interpretation.  In 2023 alone, at least 2,274 people received sentences combining credit-eligible and credit-ineligible crimes—prisoners in Mr. Bonnie's position.[3]  *See* U.S. Sentencing Comm'n, SPSS Datafile For Fiscal Year 2023, available at https://tinyurl.com/mbkt3dvt; *see also United States v. White*, 620 F.3d 401, 417 (4th Cir. 2010) (citing Commission datafiles for sentencing data).  Their average

---

[3] 2,864 people were convicted of crimes under section 924(c), which is credit-ineligible under the FSA.  18 U.S.C. § 3632(d)(4)(D)(xxii).  Terms of imprisonment under section 924(c) must run consecutive to punishments for other crimes.  18 U.S.C. § 924(c) (punishment for "use or carr[y]" of a firearm is "in addition to the punishment provided for" other crimes).  2,274 of the original 2,864 were also convicted of another, credit-eligible crime and sentenced to both terms of imprisonment and supervised release.

10

term of imprisonment is 12 years, representing $1.2 billion in incarceration costs.[4]

BOP's interpretation would deny earned time credits to all of them.

If, on the other hand, these prisoners earned maximum credits toward early

supervised release, the savings would exceed $97 million—from just one year's

sentences.  For convictions since 2019, potential savings reach $480 million.[5]  And

these figures significantly undercount the total cost, as they exclude the sentences

of non-citizens and consecutive sentences from separate proceedings.  The savings

anticipated by the FSA through 2023 is likely over half a billion dollars.

### B.    State models show Congress intended broad credit eligibility.

The state models that shaped the FSA exclude few, if any, crimes from their

credit-earning mechanisms, suggesting a strict construction of § 3632(d)(4)(D).  As

the states' experience showed, broad applicability of these mechanisms was

necessary to achieve their twin purposes of cost savings and recidivism reduction.

Texas, which Senator Cornyn cited as the model for the Act, placed no limits on

---

[4] In 2022, the average annual cost of incarceration for a person was $42,672. *See Annual Determination of Average Cost of Incarceration Fee*, 88 FR 65405 (Sept. 22, 2023).

[5] The BOP's rule for earned time credits applies to credits earned since December 21, 2018.  28 C.F.R. § 523.42(b)(2).  These numbers also include other statutes that require consecutive sentences, 18 U.S.C. §§ 929, 1028A, 1791, 3146, and 3147.  The additional data was obtained from the Commission's SPSS Datafiles For Fiscal Years 2019–2022, all available at https://www.ussc.gov/research/datafiles/commission-datafiles.

credit eligibility based on crimes of conviction.  Georgia excluded just seven crimes, and Maryland, five.  Where these states excluded crimes of conviction from their credit-earning mechanisms, they did so narrowly and based on older laws that had grouped these offenses together for sentencing purposes.

In 2011, Texas passed a prison reform bill that did *not* limit prisoners' ability to earn credits through recidivism-reduction programs based on the crime of conviction.  H.B. 2649, 82d Leg., R.S. (Tex. 2011).  Like the FSA, Texas awarded credits based on participation in an "educational, vocational, or treatment program" or a "work program."  *Id.* § 1(4)(A)–(C).  Like the FSA, Texas's reform was intended to save money.  John O'Brien, *Fiscal Note RE: HB2649*, Legislative Budget Board Fiscal Note, 82d Leg., R.S. (May 19, 2011), available at https://tinyurl.com/3abbcy2p (noting savings of nearly $50 million).  Unlike the FSA, however, Texas's credit system did not contain any carve outs.

Similarly, Georgia pursued credit-based prison reforms for fiscal reasons, as described by Rep. Collins in his support for the FSA.  Georgia's credits, available to prisoners eligible for parole, excluded just seven crimes.  In 2011, the legislatively-created Special Council on Criminal Justice Reform for Georgians released a report noting that growth in Georgia's prison population "has come at a substantial cost to Georgia's taxpayers" and that "[t]oday the state spends more than $1 billion annually on corrections, up from $492 million in FY 1990."  *Report*

12

*of the Special Council on Criminal Justice Reform for Georgians* 2 (2011), available at https://tinyurl.com/2e5t738e. In a set of recommendations focused on the effective use of "Georgia's resources," the report advised the implementation of expanded "Performance Incentive Credits," which "allow offenders to earn up to 12 months of [ ] time off their sentence for participation in work or risk reduction." *Id*. at 16.

Georgia's Department of Corrections under Governor Nathan Deal responded. In November 2011, the Department released a regulation describing the "Performance Incentive Credit (PIC) Program." Ga. Dep't of Corr., Standard Operating Procedures: Performance Incentive Credit Program, IIB01-0021 (Nov. 1, 2011). The Program awards people serving prison sentences up to 12 months credit for participation in work programs as well as in educational, vocational, substance abuse, mental health, "cognitive behavioral," and "sex offender psycho-educational" programs. *Id*. § VI(A)(3). The Program generally applies to all "[o]ffenders who have been sentenced to incarceration." *Id*. § II. The only exclusions based on the crimes of conviction are seven crimes carrying mandatory prison terms. *Id*. § VI(G)(5). Moreover, the exclusions take their shape from prior legislation treating these seven crimes together for the purposes of punishment. *See* Standard Operating Procedures IIB01-0021 § VI(G)(5) (describing prisoners excluded from credit-earning as "7 deadly sin offenders"); *see also Mikell v. Brian*,

13

2010 WL 6797007, at *13 (S.D. Ga. Nov. 9, 2010) (describing O.C.G.A. § 17–10–6.1(a), which is "informally known as Georgia's 'Seven Deadly Sins' statute").

Thus, Georgia's Program models a broadly applicable credit-earning mechanism with narrow exclusions for crimes previously grouped together for the purposes of sentencing. While Congress ultimately included a longer list of exclusions in the FSA than Georgia's model contained, Georgia's model demonstrates that such exclusions should be interpreted narrowly and against a background of sentencing-specific legislative consideration for the exclusions as a group.

Finally, in 2016, Maryland—cited by Sen. Cardin in his support of the FSA—created a system of "diminution credits" for participation in recidivism-reduction programs. Justice Reinvestment Act, 2016 Md. Laws 515 (S.B. 1005, codified at Md. Code Ann., Corr. Servs. § 3-706). The Maryland Justice Reinvestment Coordinating Council, a creature of Maryland's legislature, noted in 2015 that "Maryland still incarcerates more than 20,000 offenders, costing Maryland taxpayers $1.3 billion in corrections spending in FY2014." Final Report 1 (Dec. 2015), available at https://tinyurl.com/w94c2vc5. In developing its recommendations, the Council sought to "maximize the public safety returns on Maryland's corrections spending." *Id.* And it advised increased diminution credits for recidivism-reduction programs because "[r]esearch demonstrates that providing

14

incentives like earned time or diminution credits in prison can reduce recidivism and save taxpayer dollars." *Id*. at 16.  When Maryland's lawmakers responded to the Council's call, all prisoners were entitled to earn these credits.  2016 Md. Laws 515 § 3-706.  Indeed, these credits were subject only to a pre-existing limit on eligibility for diminution credits, comprising 5 crimes of conviction.  *See* Md. Code Ann., Corr. Servs. § 3-702(a)–(b) (West 2010).  As with Georgia, these exclusions reflected prior legislative consideration of them as a coherent set.

Congress explicitly relied on the Texas, Georgia, and Maryland models when drafting the First Step Act.  These states had proven that broad credit eligibility could reduce costs while maintaining public safety.  Where these states conditioned exclusions from credits on the crime of conviction, they did so minimally and based on prior law treating the exclusions together for the purposes of punishment.  These models suggest a narrow construction of § 3632(d)(4)(D)'s exclusions.

## C.    Congress systematically reduced BOP authority throughout the First Step Act.

The FSA repeatedly and systematically curtailed BOP discretion, expressing Congress's intent to limit, rather than expand, the agency's ability to make judgment calls.  Most significantly, the FSA positioned the Attorney General, not the BOP, as the primary authority for implementing the new programs.  The Attorney General "shall carry out" the reforms implementing earned time credits,

15

"shall develop" the recidivism reduction program, and must ensure BOP staff "demonstrate competence" in administering the program.  18 U.S.C. §§ 3631(a), 3632(a), 3632(f)(4).  Congress also established the Attorney General as a watchdog over BOP through a distinct "Quality Assurance" provision requiring "annual audits" to ensure the Bureau uses the program "in an appropriate and consistent manner."  18 U.S.C. § 3632(g).

Congress's statutory skepticism of BOP emerged throughout the FSA.  First, the FSA corrected BOP's erroneous—and too restrictive—interpretation of the good time credit (a separate credit from the earned time credit).  The FSA clarified "Congress's original intent that 54 days of good time credit be available rather than the 47 days that the Bureau of Prisons had interpreted under previous law."  164 Cong. Rec. S7642 (daily ed. Dec. 17, 2018) (statement of Sen. Cornyn).  Second, the FSA removed BOP as the sole arbiter of compassionate release motions due to its "failures" in managing the program.  *United States v. Brooker*, 976 F.3d 228, 231–32 (2d Cir. 2020).  Third, the FSA limited BOP's discretion in determining the locations of imprisonment.  *See* 18 U.S.C. § 3621(b) (requiring the BOP to prioritize locations near "the prisoner's primary residence").  Fourth, Congress prohibited BOP's practice of restraining pregnant prisoners.  18 U.S.C. § 4322.

16

Congress did not establish the Attorney General as BOP's watchdog while simultaneously granting BOP broad authority to restrict one of the Act's key reforms. Congress constrained BOP's discretion; it did not expand it.

## III. The rule of lenity resolves any ambiguity in favor of Mr. Bonnie.

Multiple courts have found § 3632(d)(4)(D) to be ambiguous, though deferring to BOP under now-defunct *Chevron* analysis. *Sok v. Eischen*, 2022 WL 17156797, at *3 (D. Minn. Oct. 26, 2022) ("[T]he Court finds that the phrase 'serving a sentence for a conviction under any of the following provisions of law,' as used in § 3632(d)(4)(D), is ambiguous."), *report and recommendation adopted*, 2022 WL 17128929 (D. Minn. Nov. 22, 2022), *aff'd*, 2023 WL 5282709 (8th Cir. Aug. 17, 2023); *Mancillas v. Fed. Bureau of Prisons*, 2023 WL 5404229, at *5 (D. Md. Aug. 22, 2023) ("Although it may appear straightforward at first blush, Mancillas's Petition highlights that ambiguity exists as to what was meant by 'serving a sentence' for certain convictions, thus rendering an individual ineligible to earn ETCs under 18 U.S.C. § 3632(d)(4)(D)."). The rule of lenity resolves this ambiguity in favor of Mr. Bonnie.

### A. The First Step Act's earned time credit provisions are penal.

Earned time credits determine the "quantum of punishment" a prisoner serves and are therefore penal. *See Weaver v. Graham*, 450 U.S. 24, 33 (1981)

17

(quoting *Dobbert v. Florida,* 432 U.S. 282, 294 (1977)); *see also Barber v. Thomas*, 560 U.S. 474, 488 (2010) (assuming that the good-time credit statute could be construed as imposing a criminal penalty). Like the good time credits at issue in *Weaver*, earned time credits under the FSA substantially alter "the consequences attached to a crime already completed" and act as "one determinant of [the] prison term." 450 U.S. at 32–33; *see also Lynce v. Mathis*, 519 U.S. 433, 440 n.12, 445–46 (1997) (recognizing that statutes governing award of time credits are penal because they affect the duration of imprisonment) (citing *Weaver*, 450 U.S. at 32).

These credits also shape decision-making through plea bargaining and sentencing. *See, e.g., Castillo v. United States*, 2024 WL 4533516, at *3 (S.D.N.Y. Oct. 18, 2024) (describing petitioner's "ineffective assistance claim rooted in advice purportedly received from his lawyer regarding the application of earned time credits awarded by the Bureau of Prisons"). The availability of time credits "is a significant factor entering into both the defendant's decision to plea bargain and the judge's calculation of the sentence to be imposed." *Weaver*, 450 U.S. at 32 (citing *Wolff v. McDonnell*, 418 U.S. 539, 557 (1974)). When defendants consider whether to accept a plea deal, they necessarily evaluate their likely release date—a calculation that turns, in part, on their eligibility for earned time credits. The same is true for judges imposing sentence. Just as parole eligibility and good-time

18

credits affect sentencing decisions, so too does the availability of earned time credits.

## B.    The rule of lenity applies.

Since the FSA's earned time credits are penal in nature, the rule of lenity applies.  "[T]he rule of lenity[] teach[es] that ambiguities about the breadth of a criminal statute should be resolved in the defendant's favor."  *United States v. Davis*, 588 U.S. 445, 464 (2019).  Lenity applies not just to statutes defining criminal conduct, but also to those establishing the scope of criminal penalties.  *See Bifulco v. United States*, 447 U.S. 381, 387 (1980) (applying lenity to resolve questions about special parole terms).  The FSA's earned time credits do just this.  Thus, the rule of lenity must resolve § 3624(d)(4)(D)'s ambiguity in favor of the more lenient interpretation.

But the rule of lenity is more than just a tiebreaker—it embodies "the instinctive distastes against men languishing in prison unless the lawmaker has clearly said they should."  *United States v. Bass*, 404 U.S. 336, 348 (1971) (quotation marks and citation omitted).  This principle—"perhaps not much less old than construction itself," *United States v. Wiltberger*, 18 U.S. 76, 95 (1820) (Marshall, C.J.)—serves two constitutional purposes.  First, it ensures notice; that "before a man can be punished, his case must be plainly and unmistakably within the statute." *United States v. Lacher*, 134 U.S. 624, 628 (1890).  Second, it

19

preserves the separation of powers by vesting "the power of punishment" "in the legislative, not in the judicial department." *Wiltberger*, 18 U.S. at 95. These twin aims carry special force in the context of the FSA, where Congress deliberately circumscribed BOP's discretion in favor of legislative direction.

The rule of lenity applies to "situations in which a reasonable doubt persists about a statute's intended scope even after resort to" ordinary tools of construction. *Moskal v. United States*, 498 U.S. 103, 108 (1990). In *Wiltberger*, for example, a sailor was charged with killing an individual on a river in China under a statute that criminalized manslaughter on the "high seas." 18 U.S. at 76, 93 (quoting Act of Apr. 30, 1790, § 12, 1 Stat. 115). Chief Justice Marshall acknowledged that it was "almost impossible to believe" that Congress sought "to distinguish between the same offence . . . on the high seas, and on the waters of a foreign State." *Id*. at 99. But because "probability is not a guide which a court . . . can safely take," *id*. at 105, the Supreme Court declined to interpret the statute as encompassing the sailor's conduct. Criminal statutes "are to be construed strictly" because of "the tenderness of the law for the rights of individuals" and "the plain principle that the power of punishment is vested in the legislative" department. *Id*. at 95.

The rule thus applies with even greater force here where the history, purpose, and structure of the FSA create more than "reasonable doubt" as to § 3632(d)(4)(D)'s intended meaning. Multiple courts have found § 3632(d)(4)(D)

20

to be ambiguous. *Sok*, 2022 WL 17156797, at \*3; *Mancillas*, 2023 WL 5404229, at \*5. The cost-saving purpose of the FSA makes it unlikely that Congress intended to leave half a billion dollars on the table by choosing BOP's preferred interpretation. The state models on which the FSA is based favor an interpretation of § 3632(d)(4)(D) that limits the effect of credit-ineligibility. And the FSA's systematic stripping of BOP's discretion in applying the Act's provisions suggests that Congress did not intend for an "administrative" BOP prerogative—aggregation under 18 U.S.C. § 3584(c)—to swamp statutory commands.

The text of § 3632(d)(4)(D) leaves unclear whether "serving a sentence for a conviction" applies to an entire aggregated term or to each specific sentence. When years of liberty hang on this ambiguity, the rule of lenity demands the more lenient reading.

## CONCLUSION

This Court should reverse the decision below and determine that Mr. Bonnie is eligible to earn time credits under the FSA.

21

Respectfully submitted,

*/s/ Timothy W. Grinsell*
Timothy W. Grinsell

HOPPIN GRINSELL LLP
11 Hanover Square, Ste. 703
New York, NY 10005
Telephone:  646.475.3550
tim@hoppingrinsell.com

*Attorneys for Due Process Institute and*
*National Association of Criminal Defense*
*Lawyers*

DATED:  November 27, 2024

22

## CERTIFICATE OF COMPLIANCE

I hereby certify that this brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B) because it contains 4,709 words, exclusive of the cover page, table of contents, table of authorities, certificates of counsel, signature block, and certificate of service.

*/s/ Timothy W. Grinsell*
Timothy W. Grinsell